**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MARYLAND
Greenbelt Division**

In re:  **MAHMOUD MUSA ABULHAWA,**                  **Case No.:  21-14649-TJC**
                                                                              **Chapter 13**

_____**Debtor.**_____

**Mahmoud Musa Abulhawa,**

                    **Movant,**

**v.**                                                                                **CONTESTED MATTER**

**Kapitus Servicing, Inc. f/k/a
Colonial Funding Network, Inc.
as servicing agent for
Strategic Funding Source, Inc.
d/b/a Kapitus**

                    **Respondent.**

_____

**RESPONSE TO DEBTOR'S OBJECTION TO CLAIM NUMBER 8-1
<u>AND RESERVATION OF RIGHTS</u>**

Kapitus Servicing, Inc. f/k/a Colonial Funding Network, Inc. as servicing agent for

Strategic Funding Source, Inc. d/b/a Kapitus ("**Kapitus**"), by counsel, hereby files this response

and reservation of rights with respect to the _Amended Objection to Claim of Kapitus Servicing,_

_Inc. f/k/a Colonial Funding Network, Inc._ filed by Mahmoud Musa Abulhawa (the "**Debtor**") on

September 29, 2021 (the "**Objection**") (Doc. 47), pursuant to § 502 of the Bankruptcy Code,

Federal Rule of Bankruptcy Procedure 3007 and applicable authority, and states as follows:

Paige Levy Smith, MD Fed. Bar No. 19912
SANDS ANDERSON PC
1497 Chain Bridge Road, Suite 300
McLean, Virginia 22101-5728
Tel. 703.893.3600
 _Counsel for Kapitus Servicing, Inc., f/k/a Colonial Funding Network, Inc.,
as servicing agent for Strategic Funding Source, Inc., d/b/a Kapitus_

## Bankruptcy Case Background

1.      On July 15, 2021, the Debtor filed his third voluntary petition under Chapter 13 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (Doc 1) (the "**Petition**").

2.      The Debtor is the sole owner, member and manager of Delicious Gourmet, LLC, a Maryland limited liability company ("**Delicious Gourmet**").

3.      The Debtor's schedules included a contingent, unliquidated, and disputed obligation to Colonial Funding Network, Inc. (defined herein as Kapitus) in the amount of $56,742.93.

4.      On September 8, 2021, Kapitus timely filed its proof of claim number 8 in the amount of $58,807.79 for Breach of Contract (Claims Register 8-1) (the "**Claim**").

5.      The basis of the Claim is a Loan Agreement (the "**Agreement**") entered into by Kapitus, Delicious Gourmet and Debtor as guarantor on August 14, 2018. On the same day, the parties also entered into a Security Agreement (the "**Security Agreement**") and Guaranty (the "**Guaranty**"). As further detailed in the Agreement, Security Agreement and Guaranty, the Debtor in exchange for a loan in the principal amount of $30,600.00 from Kapitus, granted a security interest in Delicious Gourmet's assets, including accounts receivables, and promised to pay Kapitus the repayment amount of $41,922.00 (the "**Repayment Amount**"), by authorizing Kapitus to debit specified remittances in the amount of $807.00 from Debtor's depositing bank account, SunTrust #0903, (the "**Account**") on a weekly basis. True and correct copies of the Agreement and loan documents are attached to the Claim.

## Specific Responses to Allegations in the Objection

6.      Kapitus admits the allegations in Paragraph 1 of the Objection. Notwithstanding, Kapitus expressly incorporates the reservation of rights set forth in the Claim.

7.      Kapitus admits the allegations in Paragraph 2 of the Objection.

8.      Kapitus admits the allegations in Paragraph 3 of the Objection.

9.      Kapitus admits the allegations in Paragraph 4 of the Objection.

10.     Kapitus denies the allegations in Paragraph 5 of the Objection. Answering further, see Additional Background information below.

11.     Kapitus does not have sufficient information to admit or deny the allegations in paragraph 6 of the Objection and calls for strict proof thereof. Answering further, see Additional Background information below.

12.     In response to Paragraph 7, Kapitus admits that the Debtor requested informal discovery. Answering further, Kapitus states that at the time Debtor had failed to produce documents formally requested in multiple bankruptcy cases over several months, had not issued any discovery himself, and Kapitus was not required to produce documents to the Debtor pursuant to any informal request and outside of the discovery rules, since the requests are subject to objections.

13.     Kapitus denies the allegations in Paragraph 8 of the Objection and calls for strict proof thereof.

14.     Paragraph 9 of the Objection contains only legal conclusions rather than statements of fact, and as a result, no response is necessary.  To the extent a response is required, Kapitus denies the allegations in Paragraph 9 of the Objection and calls for strict proof thereof.

### GENERAL DENIAL OF ALL ALLEGATIONS IN THE OBJECTION

15.     ALL ALLEGATIONS OR CLAIMS FOR RELIEF IN THE OBJECTION THAT ARE NOT EXPRESSLY ADMITTED ABOVE ARE HEREBY DENIED IN THEIR ENTIRETY.

## Additional Background Information

16.     In his Objection, the Debtor alleges that he was scammed after he received funds from Kapitus. He is not alleging that he did not sign the Agreement, Security Agreement, or Guaranty, or that he didn't receive the money pursuant to the Agreement. He simply states that he believes he was scammed by an individual named Demetrios Boudourakis ("**Boudourakis**"), who the Debtor believes was an agent of Kapitus. However, that is not the standard that the Debtor must meet.[1] During the 2004 Examination of the Debtor conducted by Kapitus on October 8, 2021, the Debtor agreed that he understood and signed the Agreement, Security Agreement, and the Guaranty which is the basis of the Claim and he received the funding in his Account.  Further, as set forth below, Boudourakis was not an actual or apparent agent of Kapitus, and no factual allegations in the Objection support the inference that Boudourakis was an agent of Kapitus.

17.     On August 16, 2018, Kapitus fulfilled its obligations under the Agreement by advancing $29,815.00 to Debtor's depositing Account, after deduction of fees and costs. However, by September 18, 2018, Delicious Gourmet and Debtor defaulted on their obligations under the Agreement and Guaranty, intentionally closing the Account and ceasing all payments thereafter.

18.     Prior to the default, on August 23, 2018, the Debtor called Kapitus directly and inquired whether there was a penalty to pay his balance early. Kapitus representative explained that there is no penalty, but that he may request a payoff letter and pay the remaining balance. He indicated that if he repays the loan off next Friday, he should only pay $30,000.00, instead of the Repayment Amount. After it was explained that there is a set payback amount regardless of the repayment timing, the Debtor indicated that he will "speak to his people and call [us] back."

---

[1] On October 18, 2021, Kapitus filed its Complaint to Determine the Non-Dischargeability of Debt against the Debtor pursuant to 11 U.S.C. § 523(a)(2), (a)(4) and (a)(6) based on the factual allegations and circumstances detailed in this response.

19.     Unbeknownst to Kapitus at the time, the Debtor had obtained a cashier's check in the amount of $30,000.00 on August 17, 2018 (the day after the funding of the Account) and had sent the money to a third party, Acceleration Capital Group. Debtor claims that cashier's check was lost in the mail. Subsequently, on September 4, 2018, he re-issued payment and then sent two checks, one in the amount of $30,000.00 and the other in the amount of $5,000.00, to "Acceleration Cap Group".

20.     In the interim, on September 13, 2018, the Debtor called Strategic Funding or Colonial (defined here as "Kapitus") again asking if three weekly payments had been taken from the Account, and Kapitus verified that the weekly repayments had been taken and one was forthcoming the next week (in accordance with the Agreement).  He also advised Kapitus that he had been robbed and explained that his phone and wallet had been stolen. However, when the Debtor was asked if he had ever spoken with Kapitus or if he had been robbed in September of 2018, during his 2004 Examination held on October 8, 2021, he stated that he had not spoken with Strategic or Colonial and that he was never robbed of his phone or credit cards.

21.     On September 19, 2018, when the weekly payment was first returned or not honored due to insufficient funds, Kapitus reached out to the Debtor.  At that time, upon information and belief, the Debtor stated in telephone recordings "the people who got me the loan, okay, went and did a fraud on the $30,000.00 went into the account and stole the money. And the reason you cannot get the money from the account because its zero money. So right now, I hired a lawyers and the people's name is Jimmy and he promised me to return the money back. I just hire a lawyers from New York for the problem. For your respect, guys, I got the money, that's fine, but right now I have no money. I have two choices, my lawyer told me, file bankruptcy or wait until these people return the money. . .  Yes, these people got the money from my account. He

stole it right away. They stole it from the bank. . . ." When asked for proof he affirms that he has everything and will send it shortly. He indicates that he spoke with Dimitria and now he can no longer reach them. He also indicated that Jimmy owned the business that got him the loan with Colonial. He later states, according to the recordings: "I have no problem to give you the money, guys. I have no problem at all with the funds, okay, I only have in my name $7,000. If you want to wait, wait for my lawyer, or settle on $7,000, whatever you want to do, guys, respect for you guys. . . . I didn't tell my wife, if I told my wife she would kill me . . . and these people they promised me a lot of things and then they got my routing number and everything, they got control cashier's check. I have the cashier's check with me . .  . I gave it to my lawyer. . . I am not lying to you guys, it's the truth . . . I got everything from them. . . . They took $30,000.00 and $5,000.00 and I have check where they took money from . . . I know how much you funded me . . . I am not going to lie . . . I have no problem to give you $7,000.00 . . . for respect for you. . . I do not do business like this. . . . I am out of money, you are out of money and that's not fair."

22.     On September 24, 2018, when the Debtor called Kapitus to provide his police case information against "Jimmy" from "Acceleration Capital Group", he stated, "the company that went and got me the money from you guys, went and stole the money right away."

23.     Although the Debtor was asked to provide information about this fraud, as of October 4, 2018, nothing appears to have been received by Kapitus.

24.     In reality, however, the Debtor was never robbed and the money from the Account was not taken out by anyone but the Debtor. As it was revealed by the records produced by the Debtor in this bankruptcy case, and the Debtor's testimony during his 2004 Examination, the Debtor himself withdrew two checks, one for $30,000.00 and one for $5,000.00 and knowingly paid them over to Acceleration Capital Group on his own.

25.    The Debtor clearly knew he was dealing with a separate and unaffiliated entity when he called Kapitus, but despite this clear understanding, he now gives a contrary account of the events.   Based on the sworn statement submitted to the investigator, which sets forth the Debtor's sworn testimony at the time the relevant conduct occurred, the Debtor claims he was offered the larger loan before he signed the contract with Kapitus (the "**Statement**"). The Statement is attached hereto as **<u>Exhibit 1</u>**.  The Debtor lays out his scheme in which he intended to obtain Kapitus funding for non-business purposes. The Debtor defrauded Kapitus at the time of the execution of the Agreement and related loan documents by planning to take Kapitus funding and parlay it into a much larger loan contrary to the representations and warranties in the contract. *See* Agreement, ¶1.15 (*Loan for Specific Purpose Only*) and 2.9 (*Other Financing*).

26.    The Debtor's bank statements also reflect that he intentionally closed the Account on September 13, 2018, and transferred approximately $25,000.00 to two new SunTrust accounts, thereby depleting the Account, defrauding Kapitus by using the funding for non-business purposes (including casino gambling), and preventing it from receiving weekly re-payments of its loan.

27.    The Debtor cannot claim that he was scammed, when he scammed Kapitus and misused the loaned funds.

<u>**Argument**</u>

28.    A claim or interest, proof of which is filed under § 501 of Title 11 of the United States Code, is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a). If an objection is filed, a hearing is held by the Court to determine whether the claim should be allowed or disallowed and the amount of the claim. *In Re Smith*, 1 Fed.Appx.178, 181 (4th Cir. 2001).

29.    During the claims allowance process, the burden shifts between the parties. Initially, a creditor bears the burden of establishing its claim. Federal Rule of Bankruptcy

Procedure 3001(f). Once a creditor properly executes and files a proof of claim in accordance with Federal Rules of Bankruptcy Procedure, its proof of claim is considered "*prima facie* evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f); *In Re Hartford Sands Inc*., 372 F.3d 637, 640 (4th Cir. 2004); *In Re Landbank Equity Corp*., 973 F. 2d 265, 269 (4th Cir. 1992).

30.    A properly filed proof of claim is *prima facie* evidence of validity and amount of claim and, to overcome this prima facie effect, the objecting party must bring forward evidence equal in probative force to that underlying proof of claim; only then is ultimate burden of persuasion with the proponent of proof of claim. *In Re Hartford* at 640; *In Re Johnson*, 960 F. 2d 396, 403 (4th Cir. 1992); *In Re Linkous*, 990 F.2d 160 (4th Cir. 1993).

31.    If a party objects to the claim, the objecting party carries the burden of going forward with evidence to overcome the *prima facie* validity and the amount of the claim. *In Re Moser*, 25 Fed. Appx. 161, 163 (4th Cir. 2002), *citing In Re Landbank* at 269. If the objecting party meets their burden of proof, the burden of persuasion shifts back to the claimant. *In re Harford* at 640.

32.    The Claim provides a breakdown of the principal and interest due at the time of filing of the Petition. As of the Petition date, the claim asserts principal due was $39,501.00, interest due was $6,733.54, and contractual and attorney's fees due of at least $12,573.25, for a total of $58,807.79, subject to amendment. *Claim*, at pg. 9. In addition, the Claim shows all credits applied towards the amount due and the missed payments by the Debtor and provides a detailed accounting of the Claim total. *Claim*, at pg. 55.

33.    Kapitus denies that Boudourakis or his employer or entities were an actual or apparent agent of Kapitus. The Debtor has not provided any factual support for his belief that Boudourakis was an actual or apparent agent of Kapitus other than his "belief", or that is

attributable to Kapitus. Further, the Debtor has not provided any factual support for the assertion "that the original loan the Debtor was given and the subsequent loan he was promised were provided as part of a fraudulent scheme perpetrated by Kapitus and/or its employees, agents, or apparent agents".

34.     The Debtor fails to state facts upon which the Claim can be disallowed because he received funding from Kapitus and decided, on his own, to send $35,000.00 to a third party, not affiliated with Kapitus.  Further, Kapitus asserts that at the time of the transaction, the Debtor knew Kapitus was not affiliated with Boudourakis based on phone call recordings between the Debtor and representatives of Kapitus. In the Statement, the Debtor states that "Demetria told me don't worry you can fund the fee with another loan from another lender. Then pay the first loan back after you receive the second loan." *Statement*, pp. 1. He clearly knew that another lender would be involved to fund the fee for the larger loan.  Next, he states that "I agreed to this, and on or about August 14, 2018 I received loan documents from Strategic Funding Source / Colonial Funding. I completed the paperwork and sent it back to Strategic Funding Source / Colonial Funding. Shortly after this, $30,000.00 was wired into my business account." *Id*.

35.     But in paragraph 5 of the Objection, the Debtor changes his story and states that he "believes that this claim is the product of a scam. The Debtor did not seek out a loan, but he was contacted via phone by someone claiming he was already approved for funding. A short time after receiving loan proceeds from Kapitus, the Debtor was informed that he had the opportunity to remit the proceeds of his loan as advance fees and interest for a second, larger loan." *Objection*, at ¶5.

36.     A fact that the Debtor doesn't dispute is that he knowingly signed a contract with Kapitus (Colonial Funding at the time) on August 14, 2018, for the principal sum of $30,600.00.

He testified that he was familiar with the type of loan he sought from Kapitus, and had obtained similar funding in the past.

37.    Since 2018, the Debtor's story has changed multiple times, and in his recent 2004 Examination he now claims that he received the funding from Kapitus and then Acceleration Capital Group contacted him again to obtain either a $400,000.00, or later a $1,000,000.00 loan.

38.    The Debtor does not and he cannot allege that the Agreement, Security Agreement or Guaranty are not a valid contracts, therefore, the Debtor cannot maintain an action for the disallowance of the Claim.

39.    The Debtor fails to provide a concrete timeline of the events that transpired, but the bank statements for the Account clearly show that Kapitus funded the Account, and the following day, the Debtor wrote a cashier's check to himself for $30,000.00. See **<u>Exhibit 2</u>**. The bank records further show the Debtor waited until September 4, 2018 to issue the new checks.

40.    In multiple phone recordings, the Debtor makes a distinction between Kapitus and his "sales rep". Once he realizes he has been scammed, he contacts Kapitus and incredibly tells the representative over the phone that he was robbed, and his wallet and cell phone were taken from him. Based on his testimony during the 2004 Examination, that is not true.  During the multiple times the Debtor contacted Kapitus, he admitted that he was indebted to Kapitus under the Agreement.

41.    The facts show that the Debtor remitted the funds on his own, after receiving loan proceeds from Kapitus. The Debtor received $29,815.00 in the Account after signing the Agreement and completing the funding call with Kapitus.

42.    Paragraph 8 of the Debtor's Objection states, "Debtor believes that Boudourakis was an actual or apparent agent of Kapitus and that the original loan the Debtor was given and the

subsequent loan he was promised were provided as part of a fraudulent scheme perpetrated by Kapitus and/or its employees, agents, or apparent agents, subjecting Kapitus to liability for the actions of its employee, agent, or apparent agent."

43.    However, the Debtor has failed to put forth sufficient evidence in rebuttal to the Claim, which is supported by the required documentation. "If the proof of claim is supported by the required documentation, the presumption of validity may be overcome by the objecting party only if it offers evidence of equally probative value in rebuttal." *In Re Falwell*, 434 B.R. 779, 784 (Bankr. W.D. Va. 2009)(citing *In re Holm*, 931 F.2d at 623; *In Re Fullmer*, 962 F.2d 1463, 1466 (10th Cir. 1992); *In Re Allegheny International*, Inc., 954 F.2d at 173–74).

44.    Kapitus denies actual agency relationship with Boudourakis, who was an owner, employee or agent of JTT Global Holdings. Strategic Funding Source, Inc. entered into a Sales Referral Agreement with JTT Global Holdings (the "**Referral Agreement**"), which allows JTT Global Holdings to market products, such as merchant cash advance, factoring and loan agreements to businesses and refer them to lenders, such as Kapitus.

45.    The Referral Agreement, which Kapitus reserves the right to produce subject to an appropriate stipulation and/or protective order, states that:

> **2. INDEPENDENT CONTRACTOR**. Nothing in this Agreement or in the performance thereof shall be construed to create any partnership, joint venture, relationship of principal and agent or employer and employee between SFS and Referral Provider or any of their affiliates, subsidiaries, contractors, employees or agents. Referral Provider shall not make any representations in any manner to the effect that Referral Provider is the agent, servant, employee, representative, partner, or co-venturer, of SFS, and Referral Provider shall have no authority to solicit, bind or commit SFS to any transaction. All financial, legal and other obligations associated with Referral Provider's business are the sole responsibility of the Referral Provider. Individual assigned, hired or retained by Referral Provider to perform the services under this Agreement are solely the employees and agents of Referral Provider. Referral Provider shall have sole authority and responsibility to counsel, train, instruct, discipline, review, evaluate, set the pay rates of, and terminate its employees and agents. Referral Provider will maintain all necessary payroll and personnel records and compute wages and withhold applicable federal, state and local taxes and social security payments

for their personnel. Furthermore, Referral Provider acknowledges that they shall be solely responsible for any payments related to their facilities, the purchase and maintenance of employment and/or workers compensation insurance coverage related to their employees, and that SFS shall have no responsibility for any such coverage or any similar matters.

46.     The Referral Agreement contemplates that JTT Global Holdings is its own entity and certainly not an agent of Kapitus. Therefore, there is no actual agency relationship between Kapitus and JTT Global Holdings, because Kapitus never granted actual authority.

47.     The Debtor also asserts that Boudourakis was an apparent agent of Kapitus.

48.     Under generally accepted principles of agency law, an agent's authority to act must come from a principal, and apparent authority may arise only when the words or conduct **of the principal** causes a third party to believe that the principal has consented to or authorized the agent's actions. *Allgood v. Hallmark Woods Homeowner Ass'n*, 2021 Bankr. Lexis 2155 *13; 2021 WL 3520334 (D. Md. Bkrp., August 10, 2021, Case No. 17-11781, Chptr.13, Adv. Pro. No. 19-00358); *Jackson v. Brandywine 2109 Brandywine, LLC*, 180 Md. App. 535, 565-566, 952 A.2d 304, 322-323. Reasonable reliance is a critical element of the apparent authority doctrine. *Allgood at *13*. It is important to note that "apparent authority does not arise from the subjective understanding of the person dealing with the purported agent, nor from the appearance created by the purported agent himself; instead, apparent authority only exists where the principal creates the appearance of an agency relationship." *Samra v. Shaheen Bus. & Inv. Grp., Inc.*, 355 F. Supp. 2d 483, 504 (D.D.C. 2005) *citing Ja Dan*, 898 F. Supp. at 900 (*citing Spence, Payne, Masington & Grossman, P.A. v. Philip M. Gerson, P. A.*, 483 So. 2d 775, 777 (Fla. App. 1986)); *see also Roessler*, 858 So. 2d at 1162; *Izquierdo v. Hialeah Hosp., Inc.*, 709 So. 2d 187, 188 (Fla. App. 1998); RESTATEMENT (SECOND) OF AGENCY § 27 (1958).

49.     In this case, no conduct or words of Kapitus created the appearance of an agency relationship, or caused the Debtor to reasonably believe the purported agent acted on behalf of

Kapitus. Further, the Debtor does not have sufficient evidence to show that he reasonably relied on the statements of the purported agent in consciously taking the funds loaned to him and sending them to a third party, Acceleration Cap Group, through checks he requested from his bank.

50.    For argument's sake only, even if an agency relationship was deemed to exist, which it did not, the fraudulent conduct of the purported agent would destroy the relationship as the alleged acts of the purported agent would fall far outside the scope of any agency.

51.    Further, as alleged above, the Debtor cannot rise above his own fraudulent acts in applying for the loan with Kapitus with hidden intentions to obtain an even larger loan and is prohibited and equitably estopped from complaining later that the purported agent defrauded him initially or later after receiving the funding.

52.    Therefore, the Objection should be overruled as a matter of law.

53.    As to paragraph 7 of the Objection, regarding Kapitus' refusal to participate in informal discovery, the Debtor tries to draw an inference, which is completely inappropriate. At no point, has Kapitus been required to produce discovery to the Debtor. As this Court is well aware, the Debtor refused to comply with multiple Court orders requiring him to produce documents to Kapitus in his prior case on multiple occasions, resulting in the last bankruptcy case being dismissed "for cause".

54.    The Debtor further objects to the $9,875.25 included in Kapitus' Proof of Claim as "Attorney's Fees" on the basis of §506(c). *Objection*, ¶9.

55.    Section 506(c) states: "The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property."

56.     Therefore, §506(c) is not a basis for disallowing any attorney's fees.

57.     11 USC § 506(b), which states: "To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose."

58.     Section 506(b) refers to attorneys' fees incurred post-petition, and not those that accrued as part of the contract between the parties, pre-petition. The attorney's fees are a contractual term and incorporated into the Claim. Pursuant to Section 3.3 of the Agreement, attorney's fees are 25% of the principal amount owed. However, in reality the amount of attorney's fees expended by Kapitus up to date is much higher. "Section 506(b) does not limit an *undersecured* creditor's contractual claim for attorney's fees. Section 506(b) merely codifies pre-Code law that an oversecured creditor can assert, *as part of its secured claim*, its rights to interest, costs, and attorney's fees arising under its contractual agreement." (emphasis in original) *In re Ely*, 28 B.R. 488, 491-92 (Bankr. E.D. Tenn. 1983).  Kapitus reserves the right to amend its Claim and include all of its attorney's fees incurred against the Debtor, including those additional amounts and fees claimed in its Complaint to Determine the Non-Dischargeability of Debt, and hereby further incorporates its reservation of rights as stated in the Claim.

## Conclusion

59.     The Objection contains only conclusory references to the Debtor believing he was defrauded by an agent of Kapitus and is woefully deficient in setting forth facts or legal support showing that the debt is not owed as reflected on the proof of claim, and therefore the Objection should be denied.

60. The Claim was filed with documentation in support of the claimed amounts. The Objection fails to set forth any evidence or information in rebuttal to that information; instead it is a thinly veiled attempt to have the Claim disallowed without a consideration of the merits. The Debtor fails to present evidence sufficient to demonstrate the existence of a true dispute with probative force equal to the contents of the Claim and the assertion that he was scammed by someone who he thought worked for Kapitus is insufficient to overcome the *prima facie* validity of the Claim.

### Reservation of Rights

61. Kapitus reserves all rights, claims, and defenses with respect to its claims, including, without limitation, any defenses and exhibits that it may assert and present at a hearing with respect to the Debtor's Objection, if necessary, and to further supplement its factual and legal positions set forth herein.

**WHEREFORE**, Kapitus, prays for an order overruling the Objection to Claim 8, for an allowance of the Claim in full, including as the Claim may be further amended or increased, and for such other and further relief as the Court deems just.

Date: October 29, 2021                          **KAPITUS SERVICING, INC. F/K/A COLONIAL FUNDING NETWORK, INC. AS SERVICING AGENT FOR STRATEGIC FUNDING SOURCE, INC. D/B/A KAPITUS,**

 /s/ Paige Levy Smith
Paige Levy Smith, MD Fed. Bar No. 19912
SANDS ANDERSON PC
1497 Chain Bridge Road, Suite 300
McLean, VA 22101-5728
Tel. 703.893.3600
 *Counsel for Kapitus Servicing, Inc. f/k/a Colonial Funding Network, Inc., as servicing agent for Strategic Funding Source, Inc., d/b/a Kapitus*

 /s/ Klementina V. Pavlova
W. Ashley Burgess *(admitted pro hac vice)*
Klementina V. Pavlova *(admitted pro hac vice)*
SANDS ANDERSON PC
P.O. Box 1998
Richmond, VA 23218-1998
Tel. 804.648.1636
 *Counsel for Kapitus Servicing, Inc. f/k/a Colonial Funding Network, Inc., as servicing agent for Strategic Funding Source, Inc., d/b/a Kapitus*

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of October, 2021, the *Response to Debtor's Objection to Claim Number 8-1 and Reservation Of Rights* was filed via the CM/ECF system which sent electronic notification of such filing to the following parties:

Richard B. Rosenblatt
Email:  rrosenblatt@rosenblattlaw.com
*Counsel for the Debtor*

Timothy P. Branigan
Email:  cmecf@chapter13maryland.com
*Chapter 13 Trustee*

Wayne Anthony Holman
Email:  bankruptcy@bww-law.com

Daniel Alan Ross
Email:  Daniel.ross@mccalla.com
*Counsel for Fay Servicing, LLC*

I further certify that on this 29th day of October, 2021, a copy of the foregoing was mailed first class U.S. Mail, postage pre-paid to:

Mahmoud Musa Abulhawa
8724 Hawkins Creamery Road
Gaithersburg, MD 20882
*Debtor*

Synchrony Bank
c/o PRA Receivables Management, LLC
P.O. Box 41021
Norfolk, VA 23541

*/s/ Klementina V. Pavlova*

16

Exhibit 1



**SUFFOLK DISTRICT ATTORNEY**
**TIMOTHY D. SINI**
DISTRICT ATTORNEY
**STATEMENT FORM**

C.C. # 18-991816
Date          Time
Page 1 of 2

I Mahmoud Musa Abulhawa (being duly sworn) deposes and says: that I am 61 years old. I was born on 09/02/57. I am giving this statement to Detective Investigator Reinhardt Andersen and am giving this statement freely, having received no threats or promises to do so.

I am the Owner/President of Delicious Gourmet located in Gaithersburg Maryland.

Sometime in June 2018, I received a voicemail from a female with a Spanish accent. The message left on my phone, stated that" I have good news for you", "you have been approved for a loan". This person left a phone number of 347-842-6439. I called the number back and spoke with a person who identified herself as Demetria. I recognized her as the same person that had left the voice message on my phone. Demetria said her company was called Acceleration Capital Group. She also told me that I had been approved for a small business loan. I asked Demetria what I would need to proceed with the loan. Demetria told me I needed to send her a copy of my driver's license, my business certificate, and four months of bank statements. I then took pictures of these documents and sent them via text to Demetria. ~~Vals NG Assistant to~~ A short time after this I received a call from Demetria and she told me I was approved for a loan of $400.00.00. Demetria also told me the terms of the loan was the interest needed to be paid up front. In this case the interest fee would be $15,000.00. I told Demetria that I did not have $15,000.00. Demetria told me don't worry you can fund the fee with another loan from another lender. Then pay the first loan back after you receive the second loan. I agreed to this, and on or about August 14th 2018 I received loan documents from Strategic Funding Source / Colonial Funding. I completed the paperwork and sent it back to Strategic Funding Source / Colonial Funding. Shortly after this, $30,000.00 was wired into my business account. I thought this was odd since I only needed $15,000.00. I called Demetria about this and Demetria told me that if I sent them the $30,000.00 plus another $5,000.00 as the interest up front I would be approved for a loan of $1,000,000.00. Since I needed as much working capital for my business as possible, I agreed. After this conversation Demetria instructed me where to send the upfront interest payment. The address I was directed to send the funds to was 3280 Sunrise Highway Suite 159 Wantagh, New York 11793. On or about September 4th 2018,

_checks Sent Aug. 17, 2018 by mail. Lost + New checks issued_
_Sept. 4, 2018_

False statements made herein are punishable as a class "A" misdemeanor pursuant to Section 210.45 of the Penal Law.

_(signature)_                    3/20/21

Signature of person giving statement          Date

Sworn to before me this _____ day of 2019

_____
Notary Public
State of Maryland County of Montgomery

OFFICE OF DISTRICT ATTORNEY          **COUNTY OF SUFFOLK**          CC # 18-991816
CONTINUING STATEMENT FORM                                          Date

                                                                   Page 2  of 2

CONTINUING STATEMENT OF Mahmoud Musa Abulhawa  AS GIVEN TO Detective Investigator

Reinhardt Andersen

I subsequently went to my bank which was Sun Trust, and I obtained two official checks. The first check was # 5300145361 in the amount of $5,000.00. The second check was # 5300145280 in the amount of $30,000.00. I have attached copies of both checks to this statement. After this I went to a nearby Fed Ex Office, and sent the checks to the address that Demetria had provided to me. I was told that I would receive the funds within several days. I received a money confirmation indicating I could expect delivery of the funds on 09-11-18. At a point in time after this I began to be contacted by phone and text and email by a male that identified himself as "Joe". Joe contacted me using the number 631-997-8116 and accelarationcapitalgroupinc@gmail.com . I believe that Joe was the supervisor of Acceleration Capital Group and may have been disguising his voice. Joe was contacting me letting me know the status of my loan. After a few days I still had not received the funds for the loan. I contacted Joe and he told me the funds were coming from Canada, and the routing number was wrong, additionally it was the Jewish holiday. Joe explained that's why there was a delay. After more days had passed and I still did not receive the funds. I contacted Joe via email and inquired about why I had not received the funds from the loan. Joe provided me a number of excuses and ultimately stopped returning my calls, text and email. On or about 09-24-18 , I filed a police report with the Montgomery County Police alleging fraud.  As of the date of this statement I have not received any funds from Acceleration Capital Group and I believe that Demetria and Joe from Acceleration Capital have acted in concert to steal the $35,000.00 up front fee from me and I wish to have them prosecuted. Detective Andersen has prepared this statement for me and I swear it is all true.

SWORN BEFORE ME THIS _____ DAY

OF _____, 2019

                                        _____
                                        Signature of person giving statement

_____
NOTARY PUBLIC

State of Maryland County of Montgomery

**Check Image Print**

Report ID: Check Image Print

Date: 09/13/2018
Time: 16:28:08

| Capture Date | Sequence Number | Aux OnUs | P/C | Amount | Posting Date | Posting Account |
|---|---|---|---|---|---|---|
| 09/06/2018 | 74086974 | | ████5280 | $30,000.00 | 09/06/2018 | ████9996 |

THIS DOCUMENT CONTAINS VOID TEXT ON A BLUE BACKGROUND THAT WILL APPEAR WHEN PHOTOCOPIED

SunTrust                    Official Check                    53-7691/631

                                                    5300145280

Purchaser: DELICIOUS GOURMET

Pay    THIRTY THOUSAND DOLLARS and 00 CENTS              Date    September 04, 2018

                                                            $30,000.00

To the Order of    ACCELERATION CAP GROUP

Memo

Payable at SunTrust Bank                              Authorized Signature

⑈5300145280⑈  ⑆061100790⑆              9996⑈

PAY TO THE ORDER OF
N4 BRENTWOOD C.C. CORP N2 N4
350 UNIONDALE AVE., UNIONDALE NY
09/05/2018 10:45:09 AM
BRIDGEHAMPTON BANK ACCT#
LICENSED CASHIER OF CHECKS
TRAN:
FEE: $900.00 AMh $30,000.00

Page 1 of 2

**Check Image Print**

Report ID: Check Image Print

Date: 09/24/2018
Time: 11:05:04

| Capture Date | Sequence Number | Aux OnUs | P/C | Amount | Posting Date | Posting Account |
|---|---|---|---|---|---|---|
| 09/06/2018 | 74086975 | | ████5361 | $5,000.00 | 09/06/2018 | ████9996 |



<u>Exhibit 2</u>

SUNTRUST BANK
PO BOX 305183
NASHVILLE TN 37230-5183

Page 2 of 5
36/E00/0175/0/72
0903

08/31/2018

# SUNTRUST

## Account Statement

| Deposits/Credits | Date | Amount | Serial # | Description \| Date | Amount | Serial # | Description |
|---|---|---|---|---|---|---|---|
| | 08/14 | 333.24 | | ELECTRONIC/ACH CREDIT BANKCARD 1869 BTOT DEP 519701010152304 | | | |
| | 08/15 | 266.62 | | ELECTRONIC/ACH CREDIT BANKCARD 1869 BTOT DEP 519701010152304 | | | |
| | 08/16 | 29,815.00 | | ELECTRONIC/ACH CREDIT STRATEGIC SFSFUNDING B970122 | | | |
| | 06/16 | 286.15 | | ELECTRONIC/ACH CREDIT BANKCARD 1869 BTOT DEP 519701010152304 | | | |
| | 08/17 | 532.59 | | ELECTRONIC/ACH CREDIT BANKCARD 1869 BTOT DEP 519701010152304 | | | |
| | 08/20 | 436.34 | | ELECTRONIC/ACH CREDIT BANKCARD 1869 BTOT DEP 519701010152304 | | | |
| | 08/20 | 518.31 | | ELECTRONIC/ACH CREDIT BANKCARD 1869 BTOT DEP 519701010152304 | | | |
| | 08/20 | 5,650.11 | | ELECTRONIC/ACH CREDIT BANKCARD 1869 BTOT DEP 519701010152304 | | | |
| | 08/21 | 377.62 | | ELECTRONIC/ACH CREDIT BANKCARD 1869 BTOT DEP 519701010152304 | | | |
| | 08/22 | 152.98 | | ELECTRONIC/ACH CREDIT BANKCARD 1869 BTOT DEP 519701010152304 | | | |
| | 08/23 | 11.39 | | ELECTRONIC/ACH CREDIT BANKCARD 1869 BTOT DEP 519701010152304 | | | |
| | 08/24 | 1,049.83 | | ELECTRONIC/ACH CREDIT BANKCARD 1869 BTOT DEP 519701010152304 | | | |
| | 08/27 | 526.53 | | ELECTRONIC/ACH CREDIT BANKCARD 1869 BTOT DEP 519701010152304 | | | |
| | 08/27 | 750.92 | | ELECTRONIC/ACH CREDIT BANKCARD 1869 BTOT DEP 519701010152304 | | | |
| | 08/27 | 1,483.35 | | ELECTRONIC/ACH CREDIT BANKCARD 1869 BTOT DEP 519701010152304 | | | |
| | 08/27 | 4,730.75 | | ATM DEPOSIT | | | |
| | 08/28 | .07 | | ELECTRONIC/ACH CREDIT PAYPAL VERIFYBANK 5U6V0TKQRLQ5S | | | |
| | 08/28 | .18 | | ELECTRONIC/ACH CREDIT PAYPAL VERIFYBANK 5U6PPWTBABQ5S | | | |
| | 08/28 | 713.07 | | ELECTRONIC/ACH CREDIT BANKCARD 1869 BTOT DEP 519701010152304 | | | |
| | 08/29 | 598.34 | | ELECTRONIC/ACH CREDIT BANKCARD 1869 BTOT DEP 519701010152304 | | | |
| | 08/30 | 606.24 | | ELECTRONIC/ACH CREDIT BANKCARD 1869 BTOT DEP 519701010152304 | | | |
| | 08/31 | 940.42 | | ELECTRONIC/ACH CREDIT BANKCARD 1869 BTOT DEP 519701010152304 | | | |

Deposits/Credits:  41                                      Total Items Deposited: 9

| Checks | Check Number | Amount | Date Paid | Check Number | Amount | Date Paid | Check Number | Amount | Date Paid |
|---|---|---|---|---|---|---|---|---|---|
| | 80 | 30,000.00 | 08/17 | 1113 | 120.00 | 08/17 | 1153 | 250.00 | 08/07 |
| | 80 | 80.00 | 08/22 | 1114 | 275.00 | 08/15 | 1154 | 650.00 | 08/15 |
| | *1063 | 241.49 | 08/16 | 1115 | 56.00 | 08/16 | 1155 | 325.25 | 08/14 |
| | *1090 | 165.00 | 08/01 | 1116 | 330.00 | 08/21 | 1156 | 500.00 | 08/13 |
| | *1102 | 343.06 | 08/02 | 1117 | 171.00 | 08/20 | 1157 | 200.00 | 08/13 |
| | 1103 | 150.00 | 08/02 | *1119 | 570.00 | 08/21 | 1158 | 365.00 | 08/14 |
| | 1104 | 618.00 | 08/06 | *1121 | 215.00 | 08/20 | 1159 | 400.00 | 08/13 |
| | *1106 | 80.00 | 08/06 | 1122 | 40.00 | 08/28 | 1160 | 515.15 | 08/20 |
| | 1107 | 150.00 | 08/08 | 1123 | 190.00 | 08/30 | 1161 | 393.33 | 08/21 |
| | 1108 | 260.00 | 08/08 | *1148 | 265.00 | 08/13 | 1162 | 323.62 | 08/22 |
| | 1109 | 409.99 | 08/10 | 1149 | 480.36 | 08/07 | *1166 | 300.00 | 08/22 |
| | 1110 | 645.00 | 08/10 | 1150 | 400.00 | 08/10 | 1167 | 345.29 | 08/28 |
| | 1111 | 742.50 | 08/16 | 1151 | 600.00 | 08/06 | 1168 | 920.42 | 08/28 |
| | 1112 | 162.00 | 08/15 | 1152 | 256.00 | 08/08 | 1169 | 500.00 | 08/28 |

T-082   P0002/0005 F-598                                                                 08-16-'21 16:44 FROM-



SUNTRUST BANK
PO BOX 305183
NASHVILLE TN 37230-5183

Page 7 of 11
36/E00/0175/0/72
0903
08/31/2018

# SunTrust

## Account Statement



Ck # 80          08/17          $30,000.00

Member FDIC                    Continued on next page